UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAMITRA SMITH,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>WALTER MILLER, Warden,<br><br>　　　　　Respondent. | Case No.: 1:12-cv-00790-LJO-JLT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY-ONE DAYS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department Corrections and Rehabilitation and serving a determinate sentence of twenty years. She was convicted in 2010 by a jury in the Kings County Superior Court of two counts of dissuading a witness by force or threats (Cal. Pen. Code § 136.1(c)(1)); one count of assault with force likely to cause great bodily injury (Cal. Pen. Code § 245(a)(1)); and one count of making criminal threats (Cal. Pen. Code § 422). (Lodged Document ("LD") 5).

Petitioner appealed her conviction to the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed Petitioner's conviction. (LD 5). Petitioner then filed a petition for review in the California Supreme Court which was summarily denied. (6, 7).

On May 14, 2012, Petitioner filed the instant petition. (Doc. 1). Respondent's answer was

filed on September 11, 2012. (Doc. 14). Respondent does not contend that the two grounds for relief in the petition have not been fully exhausted, except to the extent that ground two can be construed as containing a confrontation clause claim. (Doc. 15, p. 8). Petitioner did not file a Traverse.

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

I. Prosecution Evidence.

In July 2008, Yvonne and her children were harassing Latura. They threatened Latura and vandalized her car. One day, Yvonne stabbed Latura in the head and back. Tikiyie witnessed the stabbing.

Criminal charges were filed against Yvonne. Latura and Tikiyie were subpoenaed several times by the prosecution. Each time a subpoenaed issued, Latura and Tikiyie were harassed by various people. On approximately 20 separate occasions Tunstall angrily called Latura a "snitch bitch," which is a derogatory term referring to someone who cooperates with the police. One day in February, Smith's and James's sister, Tenisha, tried to attack Tikiyie while she was sitting in her car. They yelled and screamed at Tikiyie, calling her a "snitch bitch" and a "police bitch." Tenisha kicked a dent into Tikiyie's car.

On Thursday, April 9, Tikiyie and Latura received subpoenas to appear in court on April 19, 2009. Tikiyie, Latura and a few of their friends went to a night club on the following Saturday night and Sunday morning. Tikiyie wore black stiletto heeled boots, a short red dress and a red wig. Tunstall, Smith, James, Tenisha, and Kevin James were also at the night club.

Tikiyie and her friends went to the bar to get a drink. Then Tikiyie went by herself into a lounge room and sat down. Tikiyie testified that Tunstall entered the lounge, looked at her, smiled and laughed, and then left. Then Smith entered the lounge. Tikiyie testified that Smith "was loud and obnoxious, calling me snitches and bitches and we're going to get them ho's tonight, and stuff like that." Tikiyie testified Smith was looking at her when she made these statements. Tikiyie said she just smiled and kept drinking her drink. Smith left the lounge.

Tikiyie stayed in the lounge room for about 15 minutes and then walked into another room containing a dance floor. She passed James, who was standing with a few other people near the lounge room door. Tikiyie began talking to Kenney Martens. Tikiyie testified that Smith approached them. Smith grabbed Martens's arm and said, "Don't be talking to those snitch bitches. I told you about talking to snitches." Then Smith "balled her fist up and hit me in the forehead." Tikiyie said she swung at Smith "but I don't think I hit her because she kept like swinging at me, and then the next thing I know Michael James grabs my dress from behind, and I fall straight back, and I'm trying to pull my dress down because I didn't have any underwear on." While Tikiyie was on the ground, Smith, James, Kevin and another person repeatedly hit and kicked her. She heard them call her a snitch and a bitch while they were kicking and stomping her. Tikiyie testified that "all I could do is like try to cover my face and try to pull my dress down." Tunstall got involved in the fray. Tikiyie testified Tunstall "acted like he was pulling Demetria Smith off of me, and he socked me ... in my temple." Tikiyie testified that the attack continued until a security guard intervened about a minute or two later. The security guard helped Tikiyie get up and escorted her outside. Latura and other people also went outside.

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

A short time later, Tunstall went outside. Tikiyie testified that Tunstall yelled, "Yeah, I hit that bitch. Yeah, I got that snitch bitch. I bet she won't go to court and testify on that. We're going to have your heads." Tikiyie testified that Tunstall repeatedly called her a snitch bitch and said, "[A]ll you ho's do is tell." Tikiyie was angry and insulted Tunstall. Hanford police officers arrived a few minutes later. Tikiyie said she approached the officers and tried "to explain to them that I had been attacked for no apparent reason," but there "was so much chaos they told me to get in the car and leave" or they would arrest her.

Tikiyie drove to Latura's house, which took about three or four minutes. She "vomited blood" twice during the drive. Latura called 911 but Tikiyie decided the ambulance was taking too long to arrive so she drove herself to the hospital. (Although Latura and several other people were in the car with Tikiyie, none of them had a driver's license.) Tikiyie was vomiting blood and had to pull over to the side of the road. A police officer stopped the vehicle. Latura explained the situation to the officer, who escorted them to the hospital.

Tikiyie was treated in the emergency room and released. Tikiyie complained of a severe headache, nausea and vomiting. She had facial contusions with tenderness over the left temple area. She was tender in the back and upper thoracic region. There was a chip in tooth number eight. Her injuries were consistent with being punched and kicked in the head. Dr. Milton Teske testified that he believed Tikiyie suffered a concussion. Tikiyie did not suffer any acute fractures, bleeding in the brain or serious injury. She was released after being given an anti-nausea medication and Tylenol with Codeine.

Hanford Police Officer Josh Ragsdale interviewed Tikiyie while she was in the hospital. Tikiyie appeared frightened and disheveled. Tikiyie told him that she had been attacked by four people. She identified Smith, Tunstall and Kevin as three of the people who attacked her. She described the fourth person as a Black male who had dreadlocks and a long beard. Officer Ragsdale observed noticeable swelling on the left side of Tikiyie's face and a cut on her chin. He took photographs of Tikiyie's face and hands. She did not have any lacerations on her knuckles or the backs of her hand. Officer Ragsdale testified this was consistent Tikiyie's statement to him that she got "jumped" and had not been in a mutual fight. Officer Ragsdale spoke with Latura, who said she did not see anything and wanted to stay out of it.

Tikiyie called Hanford Police Detective Gabriel Jimenez the next morning. Detective Jimenez had investigated the July 2008 stabbing. He interviewed Tikiyie at the police department. During this interview, she told the detective that James was one of the people who attacked her. Tikiyie testified that she wasn't able to remember James's name at the hospital because she "was still in shock from being attacked by men. It was bad enough being attacked by a woman." Also, Tikiyie did not personally know James to the same degree as she knew the other defendants. Detective Jimenez subsequently showed Tikiyie a photo lineup and she identified "the defendants in this case as the attackers."

Tikiyie testified that as a result of the attack she had two black eyes, a chipped tooth, a scar under her lip and her body was really sore all over. She wasn't able to eat afterwards and lost about 20 pounds. Also, Tikiyie changed her mind about testifying against Yvonne. Tikiyie said that she "didn't feel comfortable" testifying, "even though I knew it was going to help my sister." And Tikiyie was afraid for her children's safety.

Latura testified when they were socializing at the night club, Smith said within her presence, but not directly to her, that "she had her bitches and her niggas in the club." Later, Latura was on the dance floor when she saw "a fight in the club and my sister she got up, and it was her getting jumped." Latura went outside and observed a verbal altercation involving Tunstall and others. Tunstall was angry and he said things "about me going to court, about me getting stabbed, calling me snitches, [calling] my sister snitches, and just say that's how they do them and all this and that, and things like that."

II. Defense Evidence.

Tunstall testified he was on the dance floor when the disc jockey announced that security was needed because there was a fight. He saw a large crowd surrounding a fight. Getting closer, he saw Smith on top of Tikiyie. Kevin and a security guard were attempting to separate the two women. Tunstall told the security guard that he could remove Smith. He pulled Smith away from Tikiyie and escorted her off the dance floor. Tunstall testified that he did not hit Tikiyie and no one kicked her. He did not see James near the fight. Tunstall testified that he went outside a few minutes later. Tikiyie, Latura and some other people were yelling and arguing. Tikiyie said some things to him but he did not reply.

Martens testified that he was talking to Tikiyie when Smith approached him and pulled him aside. Smith did not say anything. While his back was turned, Smith and Tikiyie started to fight. Martens saw Tikiyie fall to the ground. Smith got on top of her. The fight stopped when Kevin got in between Tikiyie and Smith, and Tunstall pulled Smith away from Tikiyie. Martens did not see Tunstall punch Tikiyie. Martens said James was standing next to him during the altercation.

Tenisha testified that she saw Tikiyie and Martens talking. Smith approached them and pulled Martens away from Tikiyie. Tikiyie spit on Smith and hit Smith's arm. Tikiyie and Smith started to fight. A crowd surrounded them. Tenisha testified no men were involved in the fight. Tenisha further testified that when she went outside the night club, she saw Tikiyie screaming, swearing and yelling at Tunstall.

Smith called Detective Jimenez, who testified Tikiyie told him that Smith punched her and "they tussled and went to the ground." Tikiyie did not tell him that Smith hit and kicked her while she was on the ground. Detective Jimenez watched the video. He described it as depicting a group of males who appeared to be making kicking and swinging motions at a downward position. The video was not clear and he could not identify any of the subjects.

(Doc. 15, Exh. A, pp. 3-8).

## **DISCUSSION**

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kings County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*

Lindh, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     <u>Legal Standard of Review</u>

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005), citing <u>Williams</u>, 529 U.S. at 405-406 (2000). Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. <u>Wiggins v. Smith</u>, 539 U.S. 510, 511 (2003) (citing <u>Williams v. Taylor</u>, 529 U.S. at 409).

In <u>Harrington v. Richter</u>, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Harrington</u>, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. <u>Davis v. Woodford</u>, 384 F.3d at 637, citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003). Under § 2254(d)(2), a

5

federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

**III.  Review of Petitioner's Claims.**

The instant petition itself alleges the following as grounds for relief: (1) Petitioner was denied her right to a fair trial because no African-Americans were selected for the jury, even though Petitioner, and her co-defendants, were African-American; and (2) error in permitting a prospective juror to state in open court that he knew Petitioner from school and that she posed a discipline problem for fighting.

A. Composition of the Jury.

Petitioner first contends that her federal constitutional right to a fair trial was violated because no African-Americans were selected for the jury. (Doc. 1, p. 5). This contention is without merit.

///

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

1. Facts.

Appellants are African–American.

Prospective juror No. 389, an African–American male, was in the first group of 20 prospective jurors. The court discussed the daily time schedule and asked the prospective jurors if anyone would have difficulty participating. Prospective juror No. 389 stated he taught a karate class every evening beginning at 5:00 p.m. The court asked him if he would have enough time to get to class if the jury was dismissed at 4:50 p.m. He replied affirmatively.

When prospective jurors were asked to provide occupational and educational information, prospective juror No. 389 stated that he was a retired military aircraft mechanic, had two children who were both in junior high school, and his wife was employed at a casino. In response to a question whether the prospective jurors had ever been involved in a physical altercation with another person, prospective juror No. 389 replied, "I was attacked one time. I had a guy attack me and I defended myself," using karate skills. In response to the question whether anyone was injured, prospective juror No. 389 replied: "Not severely. No, he was pretty sore. I didn't hit him in any place that would actually kill him. I just defended myself, just enough to keep him off of me. That was enough."

A total of nine jurors were excused from the first group of 20 prospective jurors. Four additional groups, consisting of nine prospective jurors each, were examined and some of the jurors were excused. Prospective juror No. 389 remained.

Prospective juror No. 399, an African–American adult female, was part of the sixth group of prospective jurors. She stated that she was married and had three children. She was a social worker employed by Kings County Human Services. Both her husband and her oldest son were correctional officers at Corcoran State Prison. Her other two children were in college. She has lived in Kings County for 15 years and had never served as a juror.

After examining the sixth group of prospective jurors, the prosecutor used a peremptory challenge for prospective juror No. 399. He passed on the next five prospective jurors and then used a peremptory challenge for prospective juror No. 389.

Outside the presence of the jury, Smith made a Batson/Wheeler motion. Tunstall and James joined in the motion. Smith's counsel argued the prosecutor had exercised peremptory challenges to excuse three African–American potential jurors. One of these prospective jurors had a son in prison, which could indicate a potential bias against the prosecution. However, in his view there was no reason other than race explaining the decision to excuse prospective juror Nos. 389 and 399. The court found "a prima facie has been made and the burden will shift to [the prosecutor] to explain to the Court the justification for the two challenges."

The prosecutor stated he excused prospective juror No. 399 because "her occupation as a social worker gives me grave concern. It tends to show more of a liberal bias, and that is the, one of the main reasons. [¶] Also the fact that she never has served on jury duty before in this county or any other also is a bias on which I relied upon that gave me cause for concern." The prosecutor stated he excused prospective juror No. 389 for several reasons. His "initial response when we started the day was that he had to be somewhere at 5 o'clock, and he's sat back there most of the day, and my thought maybe his demeanor and his attitude would change as the day went on once he reserved himself to being there, but with every peremptory, he'd lean[ ] back in the chair, looking up at the ceiling, yawning and his attitude really has not changed throughout

most of the day whenever it got closer and closer to being a likely and a potential juror." Next, the prosecutor explained, "I believe ... he answered positive to the fact that he's been in physical altercations involving alcohol, and ... I think he stated he hasn't served any jury duty as well." Finally, the prosecutor considered "the next jurors in line, and balancing all the factors, and [the next prospective juror] certainly has no prior alcohol physical incidents, [and] he's not a karate instructor who would minimize any violent conduct in the case...."

James's counsel argued that being a karate instructor did not make one a violent person and that prospective juror No. 389 had acted in self-defense during the physical altercation. Smith's counsel argued prospective juror No. 389's physical altercation was not alcohol-related and he was the victim in the incident. Further, Smith's counsel did not think prospective juror No. 389 appeared to be disinterested and, in his view, all of the prospective jurors looked bored and impatient.

The court denied the Batson/Wheeler motion, stating: "The Court has to rule on the adequacy of the justification in this matter. If they're implausible or fantastic justifications, then the Court can find them to be pretext. [¶] In this matter, it appears to this Court that the objections that [the prosecutor] found to [prospective juror Nos. 389 and 399] are proper in this matter. [¶] It appears that his reasons were other than ... for excusing impermissible group bias or prejudice."

2. The prosecutor's reasons for challenging prospective juror Nos. 389 and 399 were legitimate and race neutral.

Appellants contend that the prosecutor improperly exercised peremptory challenges to exclude two African–American prospective jurors in violation of "the state Constitution's implicit guaranty of a representative jury, ... and, in the federal Constitution, the Fourteenth Amendment's equal protection and Sixth Amendment jury trial provisions." (People v. Jones (1998) 17 Cal.4th 279, 293 .)

In Johnson v. California (2005) 545 U.S. 162, the United States Supreme Court reiterated the three-step process which guides a trial court's constitutional review of peremptory strikes:

> "... First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations .] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (Id. at p. 168, fn. omitted.)

A trial court's ruling on a Batson/Wheeler motion is reviewed for substantial evidence. (People v. Jones, supra, 17 Cal.4th at p. 293.) "'"'Because Wheeler motions call upon trial judges' personal observations, we review their rulings with "considerable deference" on appeal.'"' [Citation.] We also bear in mind that peremptory challenges are not challenges for cause—they are peremptory. We have said that such challenges may be made on an 'apparently trivial' or 'highly speculative' basis. [Citation.] Indeed, they may be made '"without reason or for no reason, arbitrarily and capriciously"' [citation]." (Id. at p. 294.)

In this case, the trial court concluded a prima facie case had been made and the burden shifted to the prosecutor to provide race-neutral reasons for excusing prospective juror Nos. 389 and 399. The prosecutor stated that he chose to exclude prospective juror No. 399 because she was a social worker and he believed individuals in this occupation were more liberal. The occupation or employment of a prospective juror is generally a race-neutral reason for excluding him or her. (People v. Trevino (1997) 55 Cal.App.4th 396, 411–412 [peremptory challenges upheld for individuals employed in social services and health care]; People v. Perez (1996) 48 Cal.App.4th

1310, 1315 [peremptory challenges upheld for individuals who worked in the social services or caregiving fields].) Also, the prosecutor cited the fact prospective juror No. 399 had never served on a jury before.

The prosecutor set forth several race-neutral reasons justifying his decision to excuse prospective juror No. 389. First, he was concerned by the prospective juror's demeanor throughout the day. In addition to expressing concern about scheduling, prospective juror No. 389 appeared disinterested in the proceedings. Race-neutral reasons for peremptory challenges often invoke a juror's demeanor, such as nervousness or inattention. (People v. Lenix (2008) 44 Cal.4th 602, 614.) "A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (Id. at p. 613.) When demeanor is cited as a reason for a peremptory challenge, the trial court must evaluate if the prosecutor's demeanor belies a discriminatory intent and if "the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." (Id. at p. 614.) Additionally, the prosecutor was concerned about this prospective juror's involvement in a fight, and the fact he had never served on a jury before. While the prosecutor made some factual errors about the circumstances of the fight, this does not in and of itself indicate the existence of a racial bias on the prosecutor's part. The prosecutor explained that he was concerned about the fight because it could indicate this prospective juror might "minimize any violent conduct."

The trial court evaluated the prosecutor's reasons and determined they were genuine and race-neutral. The court had the benefit of contemporaneous observations of voir dire. There is nothing apparent from the questions asked by the prosecutor during voir dire which raises the specter of purposeful discrimination. Since exceptional circumstances do not appear, we defer to the trial court's credibility assessment. (People v. Lenix, supra, 44 Cal .4th at p. 614.) Accordingly, we uphold the trial court's ruling and conclude appellants' constitutional jury trial and fair trial rights were not infringed.

(Doc. 15, Ex. A, pp. 8-13).

        2. <u>Federal Standard</u>.

Racial discrimination by the state in jury selection offends the Equal Protection Clause. <u>Miller–El v. Dretke</u>, 545 U.S. 231, 238, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). A criminal defendant is denied equal protection of the law if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race. <u>Eubanks v. Louisiana</u>, 356 U.S. 584, 585, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958). Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. <u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79, 85 (1986); <u>Johnson v. California</u>, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). A defendant, however, has no right to a "petit jury composed in whole or in part of persons of his own race." <u>Batson v. Kentucky</u>, 476 U.S. at 85 (quoting <u>Strauder v. West Virginia</u>, 100 U.S. 303, 305 (1879)). Rather, a defendant has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria. <u>Id</u>. at 85–86 (citing <u>Martin v. Texas</u>, 200 U.S. 316, 321 (1906); <u>Ex parte Virginia</u>, 100 U.S. 339, 345, 25 L.Ed. 676 (1879)).

So-called Batson claims are evaluated pursuant to a three-step test:

> First, the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation omitted.] Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question. [Citation omitted.] Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir.1999) (en banc).

The defendant bears the burden of persuasion to prove the existence of unlawful discrimination. Batson, 476 U.S. at 93. "This burden of persuasion 'rests with, and never shifts from, the opponent of the strike.'" Yee v. Duncan, 463 F.3d 893, 898 (9th Cir.2006) (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)). However, "the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)). The "striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated ..." Turner v. Marshall, 121 F.3d 1248, 1255 n. 4 (9th Cir. 1997) (quoting United States v. Battle, 836 F.2d 1084, 1086 (8th Cir.1987)).

        3.   Analysis.

Here, the trial judge agreed that the first Batson prong had been met, i.e., that the defense had made a prima facie showing of racial discrimination in the use of peremptory challenges for jurors nos. 389 and 399, thus shifting the burden to the prosecution to provide a race-neutral justification for the two challenges. Accordingly, the only issue is whether the trial court correctly concluded that the second and third prongs of Batson were not met.

In addressing the second Batson prong, i.e., whether the prosecution proffered a race-neutral explanation for exercising peremptory challenges for each of the two African American jury panelists, the 5th DCA indicated that the prosecution excused juror no. 399 because she was a social worker, which would indicate a liberal bias, and because of her lack of experience serving on a jury, while juror no. 389, a male African American karate instructor, was excused because he seemed bored and disinterested and because, as a karate instructor, he might be prone to minimizing the violent conduct of

which Petitioner was accused because he himself had engaged in such altercations in the past and was teaching self-defense against aggressive conduct.

Regarding juror no. 399, the appellate court concluded that her occupation as a social worker was a legitimate race-neutral explanation, citing state cases that upheld the exercise of peremptory challenges against social workers. Regarding juror no. 389, the appellate court noted that a prospective juror's demeanor is a race-neutral consideration and acknowledged that the prosecution's expressed concern about minimizing violence because he worked as a karate instructor and had been involved in fights was at least plausible. Moreover, the court also noted the trial judge "had the benefit of contemporaneous observations" during voir dire and there was "nothing apparent from the questions asked by the prosecutor during voir dire which raises the specter of purposeful discrimination." Accordingly, the court "defer[red] to the trial court's credibility assessment."

According "great deference" to the trial court's credibility findings has its source in Batson itself. Batson, 476 U.S. at 98, n. 21. The record, as discussed above, does not support Petitioner's assertion that the second prong had been met, i.e., that the prosecution had failed to offer a race-neutral explanation for dismissal of the prospective jurors. The prosecution offered plausible non-discriminatory reasons for excluding both prospective jurors. Nor does the record support a finding that the third prong was met, i.e., that Petitioner established purposeful discrimination. Clearly, a voir dire strategy that involves dismissal of individuals because of their occupation or demeanor is neither foolproof nor necessarily wise. However, it is often the case that the attorneys seek to draw fine distinctions between prospective jurors based on a variety of minutiae, some perhaps irrelevant or trivial, but nevertheless non-discriminatory in the sense that Batson uses that term. Put another way, just because the prosecutor uses a juror selection strategy that may not seem efficient to eliminate biased or prejudiced jurors is not to say that the prosecutor has engaged in purposeful discrimination. Indeed, the U.S. Supreme Court itself has expressed misgivings about requiring prosecutors to "explain the unexplainable," given how a decision to exercise a peremptory challenge may frequently be based upon "instinct not reason." See Rice v. Collins, 546 U.S. 333, 342-343, 126 S.Ct. 969 (2006) (Breyer, J. and Souter, J. concurring). Given the necessarily deferential review of such claims under Batson and the AEDPA, the Court cannot say that any purposeful discrimination took place. See Rice, 546 U.S. at

341-342 ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). Because the second and third prongs of the Batson test were not met here, the state court's adjudication was neither contrary to nor an unreasonable application of the clearly established federal standard.

B. Statements By Prospective Juror

Petitioner next contends that her right to a fair trial was violated when a prospective juror was permitted to state in open court pejorative comments about Petitioner.[2]  This contention is also without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

1. Facts.

Prospective juror No. 31 stated that he was a retired school administrator who has lived in Kings County for 45 years. His children were in their 40's and he had adult grandchildren.

The court asked the jurors if they would promise to listen to all the testimony to assess credibility. It observed, "Okay I see all heads going up and down for the most part except for [prospective juror No. 31]." Prospective juror No. 31 stated he has personal friends who are peace officers. Further, "I was a school assistant principal for 35 years. I worked closely with peace officers as a principal. I adjudicated many kinds of problems within the school setting. And if it comes down to a credibility issue, one person's word against the other, I'm going to go with the police officer." When asked what he would do if law enforcement officers were called by both the prosecution and the defense, prospective juror No. 31 stated he did not understand the question. The court explained that sometimes officers testify for both the prosecution and the defense. The court stated, "See, the fact that a person's a peace officer is just one fact to consider in making a determination." Prospective juror No. 31 responded, "Uh-huh." The court asked, "Can you keep an open mind and listen to the testimony?" Prospective juror No. 31 replied, "I have an open mind."

Later, the prosecutor asked if "there [is] anybody here who doesn't think that you would be a fair juror in this particular proceeding?" In response, prospective juror No. 31 asked if "the female defendant ever attended Lemoore schools?" The prosecutor replied that he did not know. The court asked whether he believed that was in issue in this case. Prospective juror No. 31 stated, "I had to discipline a student for fighting that—there's a strong resemblance." The court elicited the information that the fight occurred 15 or 20 years ago. Prospective juror No. 31 stated, "I've dealt with hundreds of students, so I don't remember names and so forth, but there's just a resemblance that I wanted to clear up." In response to the court's query if this would cause him to be biased to the degree that he could not be fair and impartial, prospective juror No. 31 replied, "You know, I would still look at the facts, but I think that that would—I would naturally think fighting then, fighting now." He continued, "I have enough experience with

---

[2] Respondent also contends that Petitioner's confrontation clause argument, presented within the context of this issue in the 5th DCA, is barred as unexhausted. (Doc. 15, p. 20). While the Court agrees with that analysis, a much more immediate reason exists for not considering this claim---Petitioner does not raise it in her petition.  (Doc. 1, p. 7).

people when they grow up sometimes they don't totally grow up." The court asked, "So most of the people you've dealt with back then ... probably, don't grow up?" Prospective juror No. 31 replied, "Not most, some." The prosecutor asked if he could assume Smith was not the student from 20 years ago and "just listen to the facts here in this case?" Prospective juror No. 31 replied, "I think it might have some influence." At this point, the court excused prospective juror No. 31 for cause.

Smith orally motioned for dismissal of the entire panel; Tunstall and James joined in the motion. Smith's counsel argued prospective juror No. 31 had prejudiced the jury panel against Smith due to "impermissible character evidence" and the damage was compounded when he stated that some people "don't grow up." The prosecutor argued there had not "been any taint since the issue was briefly touched on. And in the court's excusing this juror in the circumstances, this jury understands it's not to be using that information." The court denied the motion to dismiss the jury panel but offered Smith a limiting instruction. Smith's counsel replied, "When does the Court want its answer? And the reason why I'm asking, judge, is that if the Court is denying my request to dismiss, based on how the testimony comes in, I may ask for that limiting instruction or not." The court replied, "Okay." Then Smith's counsel said, "I'd like to reserve that issue."

Following prospective juror No. 31's excusal, numerous peremptory challenges were used and additional prospective jurors were called to take their places. The court reminded the prospective jurors of the presumption of innocence and the prosecution's burden of proof beyond a reasonable doubt.

After the jury was sworn, the jury was instructed on the presumption of innocence and the burden of proof beyond a reasonable doubt. It was also instructed that it must "use only the evidence that is presented in the courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider as evidence." The jury was reinstructed on these principles prior to deliberating.

Near the end of the trial, Smith orally motioned for all of her objections "starting from the beginning of the trial" to be "federalized." The motion was granted. James and Tunstall did not join in this motion.

At no time during trial did any of the appellants request a limiting instruction directing the jury to disregard any comments made by prospective juror No. 31.

2. Denial of the motion to discharge the jury panel was not an abuse of discretion; appellants' right to an impartial jury was not infringed.

Smith argues the trial court abused its discretion and infringed her constitutional right to a fair jury by denying her motion to dismiss the entire jury panel. Tunstall and James join in Smith's argument. As will be explained, we review rulings on motions to dismiss a jury panel under the deferential abuse of discretion standard. We discern no error or violation of appellants' constitutional jury trial rights.

A criminal defendant has the constitutional right to a determination of guilt or innocence by a fair and impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) A trial court's ruling denying a motion to dismiss the venire panel is reviewed for an abuse of discretion. (People v. Medina (1990) 51 Cal.3d 870, 889 (Medina); People v. Nguyen (1994) 23 Cal.App .4th 32, 41–42.) "The conclusion of a trial judge on the question of individual juror bias and prejudice is entitled to great deference and is reversed on appeal only upon a clear showing of abuse of discretion." (People v. Martinez (1991) 228 Cal.App.3d 1456, 1466 (Martinez).) The trial judge is in a better position to gauge the level of bias and prejudice created by comments made during voir dire. (People v. Nguyen, supra, 23 Cal.App.4th at p. 41.)

The totality of the circumstances surrounding jury selection is examined by the reviewing court when assessing the trial court's exercise of discretion. (Martinez, supra, 228 Cal.App.3d at p. 1465–1466.)

Our Supreme Court's opinion in Medina, supra, 51 Cal.3d 870, guides our resolution of this issue. There, five prospective jurors made biased and inflammatory remarks against the defendant. These remarks included statements such as even the defendant's "'lawyers think he's guilty,'" and "'bring the guilty S.O.B. in, we'll give him a trial, and then hang him.'" (Id. at p. 888.) The jurors who made the comments were excused and the remaining prospective jurors affirmed their abilities to be fair and impartial. Our Supreme Court affirmed the trial court's denial of the defendant's motion to excuse the venire panel, explaining:

> "We believe the trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required. Defendant cites no case, and we have found none, indicating that such a drastic remedy is appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks.... [D]ischarging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." (Medina, supra, 51 Cal.3d at p. 889.)

Smith argues this issue should be decided based on the presumption of prejudice that is triggered upon a showing of juror misconduct. She principally relies on People v. Nesler (1997) 16 Cal.4th 561, which involved misconduct committed by sworn jurors during jury deliberations. We are not persuaded. The impact of biased statements made by prospective jurors on the rest of the venire is not evaluated by the same standard as juror misconduct which occurs during trial or deliberations. A presumption of prejudice resulted from juror misconduct, but not from the responses of a prospective juror to questions during voir dire. The abuse of discretion standard is applied to questions of individual and group bias during voir dire. (Martinez, supra, 228 Cal.App.3d at pp. 1463–1467.)

People v. Henderson (1980) 107 Cal.App.3d 475 (Henderson) and People v. Vernon (1979) 89 Cal.App.3d 853 (Vernon ) are factually similar to the matter before us. In Vernon and Henderson prospective jurors disclosed potentially prejudicial factual information about a party during voir dire. Medina and Vernon demonstrate that a comment containing factual information about the defendant or the victim does not necessarily require the drastic remedy of discharging the venire. Further, they show that the trial court is not absolutely required to conduct an inquiry of the remaining jury venire after the prospective juror who made the prejudicial or biased remarks is excused. In neither Henderson nor Vernon was such an inquiry conducted.

In Vernon, prospective jurors were asked if anyone close to them had been a crime victim. A prospective juror responded that the defendant "had been tried for raping her niece." (Vernon, supra, 89 Cal.App.3d at p. 865.) The court immediately excused the prospective juror on its own motion and continued with voir dire. On appeal, the defendant argued the court erred by failing to sua sponte admonish the jury to disregard the remark or declare a mistrial. The appellate court concluded admonishment "would have had a more deleterious than beneficial effect by emphasizing the remark," and defense counsel's failure to request an instruction "was a wise tactical decision." (Id. at p. 865.) Then it explained that a mistrial "should not be declared where the court is satisfied no injustice has resulted or will result. [Citations.]" (Ibid.) In light of the trial evidence, the appellate court "deem[ed] it unlikely the remarks influenced the verdict." (Ibid.)

In Henderson, a prospective juror was excused for cause after she revealed that the victim had

been her client in psychotherapy that year. The appellate court upheld the denial of the defendant's motion to dismiss the venire panel, reasoning that "[i]t was within the sound discretion of the court to conclude the prospective juror's statement was nonprejudicial and to refuse to dismiss the entire jury panel." (Henderson, supra, 107 Cal.App.3d at p. 493.)

Having examined the entirety of the jury selection proceedings, we conclude the trial court properly exercised its discretion when it refused to dismiss the entire jury panel. Prospective juror No. 31's comments about Smith's resemblance to a former student who got in a fight 15 to 20 years ago, and his opinion that some people don't "grow up," are substantially less inflammatory than were the comments considered in Henderson, Vernon and Medina. Prospective juror No. 31 did not definitely declare that Smith was the former student he remembered. His opinion that maturity levels vary is not particularly inflammatory and is within common knowledge. We reject Smith's characterization of prospective juror No. 31 as "an authoritative, expert-like source." The trial court was in the best position to observe the reactions of other prospective jurors to gauge the possible level of prejudice. (Martinez, supra, 228 Cal.App.3d at p. 1466.) The sworn jurors were properly instructed that it was only to consider evidence received at trial and informed evidence is sworn testimony of witnesses. It is presumed that the jury followed its instructions. (People v. Avila (2006) 38 Cal.4th 491, 574.) The jury selection system worked as intended by drawing out attitudes and biases of the prospective jurors. For these reasons, we hold denial of the motion to excuse the jury panel was not an abuse of discretion and this ruling did not infringe appellants' constitutional rights to a fair trial and an impartial jury. (Medina, supra, 51 Cal.3d at p. 889 .)

In conclusion, we mention that Smith's reliance on Mach v. Stewart (9th Cir.1997) 137 F.3d 630 (Mach), a federal habeas corpus proceeding following petitioner's conviction for sexual conduct with a minor, is misplaced. "Decisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts." (Raven v. Deukmejian (1990) 52 Cal.3d 336, 352.) Also, California law does not indulge in a presumption of jury taint or prejudice arising from a prospective juror's remarks as the Ninth Circuit did in Mach. (Medina, supra, 51 Cal.3d at p. 889.) We are bound to follow the principles enunciated by our state's highest court. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.) Finally, Mach is factually distinguishable. Prospective juror No. 31's statement that Smith resembled a student who had been in a fight 15 or 20 years ago is not comparable to an unequivocal assertion by a social worker that children do not lie about being sexually assaulted.

(Doc. 15, Ex. A, pp. 13-21).

2. Federal Standard.

The Sixth Amendment right to trial by jury "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). If the jury is exposed to extrinsic facts not introduced as evidence, a defendant is deprived of his right to confrontation, cross-examination, and assistance of counsel under the Sixth Amendment. Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir.1988). While the Supreme Court has never rejected the idea of implied juror bias, implied bias by a juror has rarely been applied. See United States v. Plache; 913 F.2d 1375, 1377 (9th Cir. 1990); Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990). "Only in extreme or extraordinary cases should bias be presumed." Plache; 913 F.2d at 1377, *quoting*, Tinsley, 895 F.2d at 527.

"[A] petitioner is entitled to habeas relief only if it can be established that the constitutional error had 'substantial and injurious effect or influence in determining the jury's verdict.'" Lawson v. Borg, 60 F.3d 608, 612 (9th Cir.1995), *quoting*, Brecht v. Abrahamson, 507 U.S. 619, 637 & n. 9,113 S.Ct. 1710, 1722 & n. 9 (1993). The Ninth Circuit has found that whether a constitutional error is harmless is not a factual determination entitled to the presumption of correctness under 28 U.S.C. § 2254(d). Lawson, 60 F.3d at 612; Dickson, 849 F.2d at 405; Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir.1987). Thus, this Court does not simply defer to the California court's finding that there was no prejudice.

### 3. Analysis.

Here, prospective juror no. 31, a former school administrator, indicated during voir dire that he noticed a resemblance between Petitioner and a student he had 15 or 20 years earlier that had engaged in fighting. No. 31's feeling was that "fighting then, fighting now." Although he indicated he could be fair and impartial, he also opined that "some" problem students just never "grow up." He stated that if he thought Petitioner was the student from 15 to 20 years ago, it "might have some influence" over his deliberations. He was excused for cause. Subsequently, the defense moved for dismissal of the entire jury panel on the grounds that juror No. 31 had prejudiced the entire panel against Petitioner through "impermissible character evidence," compounded by his opinion that some students just never grew up. The trial court denied the motion to excuse the entire panel, but offered to give a limiting instruction to the jury. However, Petitioner's attorney asked to reserve his decision on that instruction and ultimately never requested it.

As Respondent correctly observes, there is no clearly established federal law, as defined by the Supreme Court, holding that an entire jury panel must be dismissed when potentially disparaging comments are made during voir dire by prospective jurors about the criminal defendant. Thus, it is difficult to conclude that the state court's adjudication was "contrary to or an unreasonable application of clearly established federal law." See Knowles v. Mrzayance, 556 U.S. 111, 122 (2009)("It is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court].").

Moreover, the jurors are presumed to be impartial, Irvin v. Dowd, 366 U.S. at 723, and are

presumed to follow the trial court's instructions.  <u>Weeks v. Angelone</u>, 528 U.S. 234 (2000).  In this case, the jurors were instructed that they "must decide what the facts are in this case," that they "must use only the evidence that is presented in the courtroom," that "'[e]vidence' is the sworn testimony of witnesses, the exhibits submitted into evidence, and anything else [the judge] tell[s them] to consider as evidence," and that the jurors should "disregard anything [they] see or hear when the court is not in session."  (Clerk's Transcript ("CT"), p. 407).  The record contains no evidence that the jurors did not follow these instructions.

      Finally, it should be noted that the 5th DCA cited various California cases that had considered statements far more damaging than those related herein and found no federal due process violation. Indeed, in this case, it was never established that Petitioner was in fact the individual involved in fighting 15 to 20 years ago or that she was the same individual whom juror No. 31 recalled. Additionally, the defense had the opportunity to request a specific limiting instruction regarding this issue, but chose not to request it, presumably to avoid drawing further attention to the comments at the close of the case.  Had the defense believed that juror No. 31's pre-trial comments were that prejudicial, he certainly would have requested such an instruction.

      Petitioner's reliance on <u>Mach v. Stewart</u>,137 F.3d 630 (9th Cir.1998) (<u>Mach</u>), is misplaced. Mach was charged with sexual conduct with a minor under 14 years of age. The victim was an eight-year-old girl who claimed that while she was at Mach's home visiting his daughter, he had performed an act of oral sex on her. In <u>Mach</u>, the court summarized the relevant voir dire as follows:

> The first prospective juror to be questioned during voir dire was Ms. Bodkin, a social worker with the State of Arizona Child Protective Services. Bodkin stated that she would have a difficult time being impartial given her line of work, and that sexual assault had been confirmed in every case in which one of her clients reported such an assault. The court continued to question Bodkin on this subject before the entire venire panel. The judge's questions elicited at least three more statements from Bodkin that she had never, in three years in her position, become aware of a case in which a child had lied about being sexually assaulted. The court warned Bodkin and the venire panel as a whole that 'the reason we have trials is to determine whether or not a person is guilty of the charges made against him, and you do that by seeing what the state has to give you by way of evidence and you apply that to whatever you find to be the facts. You listen to the arguments of counsel.' The judge went on to ask Bodkin whether she thought she could do that, to which she responded that she would try, and that she 'probably' could.

<u>Mach, supra</u>, 137 F.3d at pp. 631–632.

      Upon further questioning, Ms. Bodkin indicated she had taken psychology courses and worked

17

extensively with psychologists and psychiatrists and had taken courses in child psychology. Mach's conviction was affirmed by the Arizona Court of Appeals. The Arizona Supreme Court denied review. A writ of habeas corpus was denied by the district court, but the court of appeals reversed, concluding that the court's failure to grant a mistrial or conduct further voir dire to determine whether the panel had in fact been infected by Ms. Bodkin's statements rises to the level of "structural error." (Mach, supra, 137 F.3d at p. 633.) In so ruling, the Ninth Circuit noted that "[t]he result of the trial ... was principally dependant [sic] on whether the jury chose to believe the child or the defendant," that "[t]he extrinsic evidence was highly inflammatory and directly connected to Mach's guilt," and that reversal was warranted even under the harmless error standard. Id. at 634.

The facts in Mach are clearly distinguishable from those here. Juror No. 31 did not hold himself out as a psychologist or sociologist or as an expert on aggressive behavior by children, but instead offered his anecdotal opinions based on his career as a school administrator. The huge difference between an "expert's" unqualified statement that children do not lie about sexual assault, in a case that turned upon whether the jurors believed the victim or the accused, and a generic anecdotal opinion by a former school administrator that those who fight as children tend to fight as adults, in a case where multiple witnesses gave conflicting accounts of what transpired, cannot be overstated. Given the greatly differing contexts of the two cases, it cannot be said, as the Ninth Circuit noted in Mach, that Juror No. 31's comments were "highly inflammatory and directly connected to [Petitioner's ]guilt" so as to rise to the level of structural error. This view is further supported by the fact that the prospective juror's comments were never directly connected to Petitioner since Juror No. 31 never expressly stated that Petitioner was the individual whom he recalled as fighting many years earlier.

For all of these reasons, the Court concludes that the state court adjudication was not contrary to nor an unreasonable application of clearly established federal law. However, even were that not the case, Petitioner fails to show that the brief comments by juror No. 31 had a substantial and injurious effect or influence in determining the jury's verdict. Accordingly, any error would be harmless. Brecht v. Abrahamson, 507 U.S. 619, 637-638, 113 S.Ct. 1710 (1993).

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

(Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 21 days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within 10 days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 9, 2014**                              **/s/ Jennifer L. Thurston**
                                                                           UNITED STATES MAGISTRATE JUDGE